CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

NUMBER: 07-14595          DIVISION: L-6

STATE OF LOUISIANA, EX REL, CHARLES C. FOTI, JR.

versus

ALLSTATE INSURANCE COMPANY, LAFAYETTE INSURANCE COMPANY, XACTWARE, INC., MARSHALL & SWIFT/BOECKH, LLC, INSURANCE SERVICES OFFICE, INC., STATE FARM FIRE AND CASUALTY COMPANY, USAA CASUALTY INSURANCE COMPANY, FARMERS INSURANCE EXCHANGE, STANDARD FIRE INSURANCE COMPANY, MCKINSEY & COMPANY

FILED:_____

_____
DEPUTY CLERK

## PETITION FOR TREBLE DAMAGES, INJUNCTIVE RELIEF AND JURY TRIAL BROUGHT BY THE LOUISIANA ATTORNEY GENERAL

The State of Louisiana through its Attorney General, Charles C. Foti, Jr. and undersigned counsel, bring this *parens patriae* action to enforce the laws of this state, more specifically, the Louisiana Monopolies Act, and to redress the wrongs committed by defendants against this state and its citizens. This action seeks forfeiture of illegal profits, treble damages and injunctive relief.

### COMPLAINT

1.

Defendants formed a combination for the illegal purposes of suppressing competition in the insurance and related industries, and to obtain greater illegal wealth for themselves than was possible if acting individually.

Defendants' combination and conspiracy operated throughout, and in all parts of, the State of Louisiana and continues to operate to manipulate commerce and to restrain trade in this state. The acts of this combination have seriously impeded the economic growth and disaster recovery of this State and its citizens and effectuated an on-going fraud on commerce in this state. The combination and conspiracy between and among Defendants has adversely affected competition and trade within both the construction and homeowners' insurance industries in Louisiana.

EXHIBIT

7

2.

In a scheme to thwart policyholder indemnity and in direct violation of their fiduciary duties, insurer defendants and others continuously manipulated Louisiana commerce by rigging the value of policyholder claims and raiding the premiums held in trust by their companies for the benefit of policy holders to cover their losses as taught by McKinsey Company.   Insurers coerced and intimidated their employees into compliance with the McKinsey principle.   Insurers coerced their policy holders into settling their claims of damages for less than their value by editing engineering reports, delaying payment and forcing policy holders to litigate claims to receive full value.   All defendants, and other unnamed competing insurance companies, conspired, at all material times herein, to horizontally fix  and/or manipulate prices of repair services utilized in calculating the amount(s) to be paid under the terms of Louisiana insureds' insurance contracts with Insurers for covered damage to immovable property.

3.

Defendants, with the explicit approval of insurer management, deliberately designed a means to reduce claim payments, commonly referred to as deny, delay and defend.  Louisiana's insureds were forced to buy property insurance (commercial or homeowners) which likely would never provide full coverage for a loss.

4.

By using the same or substantially similar damage-estimating software, defendants signal their acquiescence to low balling claim payouts.  Those insurers who failed to participate in this conspiracy were economically coerced into compliance by the competitive advantage gained in having excessive profits to leverage against their competitors.  By the time Hurricanes Katrina and Rita struck Louisiana in 2005, virtually all of the property damage insurers were setting premiums and adjusting claims under this arrangement.

5.

This continuous arrangement gave insurers an unjust advantage over policy holders, which they took advantage of before, during and after the greatest disaster this country has ever suffered, by reaping huge profits from the misfortunes of persons whom they pledged to protect from risk of loss. They raised insurmountable odds against policy holders' abilities to recover.

6.

The schemes operated under cover of secrecy and were perpetrated despite the fact of numerous past law suits against insurers.

## JURISDICTION AND VENUE

7.

This Court has subject matter jurisdiction under Louisiana Revised Statutes §51:121, et seq. as this action brought is entirely and exclusively under Louisiana state law and is not intended, directly or implicitly, to invoke or assert any federal causes of action.

8.

This Court has personal jurisdiction over the Defendants because the Defendants are authorized by the Louisiana Department of Insurance to transact, and regularly do transact business in the State of Louisiana, because Defendants contract to provide insurance and insurance services within the State of Louisiana, and because Defendants' unlawful conduct has caused and will continue to cause injury throughout the State of Louisiana.

9.

This action is brought by the Attorney General to restrain and enjoin and to seek other relief and damages for Defendants' violations of Louisiana Revised Statutes § 51:121, et seq. Venue in this court is proper pursuant to § 51:131 because Defendant Lafayette Insurance Company's domicile is Orleans Parish, and the other Defendants carried out activities that gave rise to the claims for relief in Orleans Parish and elsewhere in this State.

## THE PARTIES

10.

Pursuant to Revised Statute §51:138, the Attorney General, Charles C. Foti, Jr., is authorized to enforce *all* suits arising under the Monopolies Act.  Pursuant to Art. IV, § 8 of the Louisiana Constitution, the Louisiana Attorney General is mandated to institute, prosecute, or intervene in any civil action or proceeding as necessary for the assertion or protection of any state right, and further, pursuant to §13:5036, he is authorized to bring any suit he deems necessary for the protection of any state right.

11.

The following are presently named defendants in the above captioned matter:

- 3 -

a.  **ALLSTATE INSURANCE COMPANY,** (hereinafter "Allstate") is a foreign insurer, domiciled in Illinois, doing business in the State of Louisiana and which issued polices of insurance in this State. At all material times, Defendant Allstate was a subsidiary and/or member company of the Allstate Insurance Group and all allegations contained herein were at the direction and/or implementation of Allstate Insurance Group.

b.  **LAFAYETTE INSURANCE COMPANY,** (hereinafter "Lafayette") is a domestic corporation licensed to issue insurance policies and in fact issuing insurance policies in the State of Louisiana. At all material times, Defendant Lafayette was a subsidiary and/or member company of United Fire Group and all allegations contained herein were at the direction and/or implementation of United Fire Group.

c.  **XACTWARE, INC.,** (hereinafter "Xactware") is a foreign corporation, domiciled in Utah, with its principal place of business in Utah, not authorized to do business in Louisiana but having sufficient minimum contacts through repeated electronic communications with various insurers in this state during the claims handling process following Hurricanes Katrina and Rita. After August 2006, Defendant Xactware was a subsidiary and/or member company of Insurance Services Office, Inc. (ISO) and all allegations contained herein were at the direction and/or implementation of ISO.

d.  **MARSHALL & SWIFT/BOECKH, LLC,** (hereinafter "MSB") is a foreign limited liability company, domiciled in Wisconsin, not authorized to do business in Louisiana but having sufficient minimum contacts through repeated electronic communications with various insurers in this state during the claims handling process following Hurricanes Katrina and Rita.

e.  **INSURANCE SERVICES OFFICE, INC.,** ("hereinafter ISO") is a foreign corporation, domiciled in New Jersey, not authorized to do business in Louisiana, but having sufficient minimum contacts, including hosting ISOTECH conference at the end of October, 2007 in New Orleans, as well as repeated electronic communications with various insurers in this state during the claims handling process following Hurricanes Katrina and Rita. After August of 2006, Xactware was a wholly owned subsidiary and/or member company of ISO and all allegations after August of 2006, contained herein, were at the direction and/or implementation of ISO.

f.  **STATE FARM FIRE AND CASUALTY COMPANY,** ("State Farm") is a foreign

insurer, domiciled in Illinois, authorized and doing business in the State of Louisiana and which issued policies of insurance to the Plaintiffs/Insureds, and other persons that are similarly situated, that insured against various risks of loss to immovable property. At all material times, Defendant State Farm was a subsidiary and/or member company of the State Farm Group and all allegations contained herein were at the direction and/or implementation of the State Farm Group.

g.    **USAA CASUALTY INSURANCE COMPANY** (hereinafter "USAA") is a foreign insurer, domiciled in Texas, authorized and doing business in the State of Louisiana and which issued policies of insurance to Louisiana citizens that insured against various risks of loss to immovable property. At all material times, Defendant USAA was a subsidiary and/or member company of USAA Group and all allegations contained herein were at the direction and/or implementation of USAA Group.

h.    **FARMERS INSURANCE EXCHANGE** (hereinafter "Farmers") is a foreign insurer, domiciled in California, authorized and doing business in the State of Louisiana and which issued policies of insurance to Louisiana citizens that insured against various risks of loss to immovable property. At all material times, Defendant Farmers was a subsidiary and/or member company of The Farmers Group and all allegations contained herein were at the direction and/or implementation of The Farmers Group.

i.    **STANDARD FIRE INSURANCE COMPANY**, (hereinafter "Travelers") is a foreign insurer, domiciled in Connecticut, authorized and doing business in the State of Louisiana and which issued policies of insurance to Louisiana citizens that insured against various risks of loss to immovable property, including but not limited to, loss and damage caused by wind. At all material times, Defendant The Standard Fire Insurance Company was a subsidiary and/or member company of St. Paul Travelers Companies and all allegations contained herein were at the direction and/or implementation of St. Paul Travelers Companies.

j.    **MCKINSEY & COMPANY** (hereinafter "McKinsey & Co." or "McKinsey") is a foreign company, domiciled in New York, not authorized to do, but doing business in Louisiana, and having sufficient minimum contacts with this State, in particular consulting with The Louisiana Recovery Authority and Chairman Don Powell.

**BACKGROUND**

12.

**Allstate, Lafayette, State Farm, USAA, Farmers, and Travelers** (hereinafter "Defendant Insurers" or "Insurers") write policies of insurance covering immovable property, commercial and residential, in the State of Louisiana. Xactware and MSB write software programs utilized by Insurers to value covered immovable property damage, commercial and residential, in the State of Louisiana.

13.

**FORMATION AND OPERATIONS OF THE COMBINATION**

McKinsey, known as "The Firm" was founded in 1926 and is one of the world's most powerful corporate advisers. Its client base is huge and encompasses 2/3s (two-thirds) of the Fortune 1000. It is the chief advisor and key architect of strategic thinking for.147 of the world's 200 largest corporations, including 80 of the top 120 financial services firms, 9 of the 11 largest chemical companies and 15 of the top 22 health-care and pharmaceutical companies. McKinsey became the "standard setter" and thus, the agent of the combination formed to regulate the insurance industry, which greatly impacts Louisiana commerce.

14.

McKinsey, since the 1980s, has been and is the architect of changing the insurance industry from one guided by the indemnity and fiduciary principles which it advertises, to an industry that raids the insurance premiums claims trust funds and diverts the premiums payments to management and/or shareholders, while underpaying claims and victimizing policyholders. The premium trust fund is affected with the public interest.

15.

Known McKinsey clients pertinent to this matter include, but are not limited to Allstate, State Farm, and USAA. During the course of this matter, the Louisiana Attorney General will uncover more of McKinsey clients and participants in the combination to privately regulate the insurance industry.

16.

McKinsey & Company ("McKinsey") initially advised insurers to stop "premium leakage" by undervaluing claims using the tactics of deny, delay, and defend. The entire combination is dedicated to preventing "premium leakage" to the detriment of the insureds. The first insurers to adopt the principles invited others to adopt them as well. Many, if not most, agreed. Those who

adopt the principles adopt a system to raid the premium claims trust that insurers are required to maintain. By undervaluing the value of the claims, insurers are free to raid the claims trust for the benefit of management and/or stockholders.

17.

McKinsey obtains clients "by word of mouth;" as knowing that a competitor has hired McKinsey has historically been a strong impetus for companies to seek McKinsey's assistance themselves.

18.

McKinsey's clients pay handsomely for management advice to increase profitability. McKinsey protects from public scrutiny the results of its involvements with clients.

19.

Insurance Services Office ("ISO") is a leading provider of statistical, actuarial, and underwriting information for the property/casualty insurance and risk management industries. It provides products and services that help measure, manage, and reduce risk. It provides data, analytics, and decision-support solutions to professionals in the insurance industry. The company gathers premium, claim and loss data that it files with state regulators; the data is used to evaluate the price of insurance in each state. Its clients use ISO's databases and services to classify and evaluate a variety of risks and detect potential fraud. It is also an agent of the combination.

20.

In the past, ISO published suggested combined premium rates for specific lines of business in specific geographical areas that were inclusive of all loss costs, expenses, premium taxes, contingencies, and profit margins until this practice was challenged as a violation of antitrust laws.

21.

Currently, ISO publishes pure loss costs leaving the "loading" of expenses and profit margins on top of loss costs for the individual member companies to supply in calculating final premium rates. It is difficult to discern a difference in ISO's current practices and those which were condemned under federal antitrust laws in the past.

22.

Insurance Services Office, Inc. ("ISO") facilitates the operations of the combination by providing a database and other computer programs which insurers tap into for standardization of

claims regardless of the individual value of the claims. ISO also provides standard policy forms and actuarial data on which premiums are based. ISO is the agent of the combination while simultaneously setting standards upon which insurance regulators rely.

23.

Many property and casualty insurers use the ISO and National Council on Compensatory Insurance ("NCCI") for rate-making purposes. These agencies receive information about premiums and losses by class code, state and territory to establish loss-cost figures. Individual insurance companies then file loss-cost 'multipliers,' expense factors for each company, that are multiplied by the loss costs for each business line to determine rates.

24.

ISO publishes on its website, *inter alia*, that any business will get "measurable savings from unifying your rating system on a single platform while eliminating redundant, resource-intensive rate validations and testing."

25.

Insurers accomplish the illegal diversion of claims funds, in part, by using damage estimate computer programs such as Xactimate (manufactured by Xactware) and IntergriClaim (manufactured by MSB) that are manipulated to reduce the value of claims.

26.

ISO also gathers combined financial results for the entire insurance industry. It contributes to the abilities of insurers to operate in a shroud of secrecy. The data provided by ISO is tainted by collusion and self-interest to the detriment of the insureds.

27.

Farmers Insurance Group produced a video in 1999, with its CEO Marty Feinstein explaining that Farmers 'was granted entree to the methods of the combination, implicating Fireman's Fund, Royal, USF &G, Amica, Progressive, State Farm, Allstate, American Family, Safeco, USAA, and Hartford. In particular, Farmers was shown, by the above named companies, the technologies (software produced by Xactware and MSB) used in the claims handling scheme. Farmers adopted the use of the Xactimate program as a direct result of those consultations.

28.

The combination has grown with rapid strides. It threatens the welfare and liberties of

consumers because it preys on policyholders at the time of their greatest need and helplessness, and leverages the incredible economic and legal power of the insurance industry. As such, it runs afoul of the Louisiana Monopolies Act.

29.

Using these tools, insurers have combined to accumulate vast wealth for themselves by violating the indemnity principle upon which the industry was founded and by violating their fiduciary duties to their insureds. This combination has greatly impeded the ability of the entire state to recover from the devastating effects of Hurricanes Katrina and Rita.

30.

The power and control of this insurance combination is explained in the paragraphs that follow. The combination has interfered with and manipulated the natural flow of commerce in Louisiana, extracted monopoly rents from victims and inflicted huge economic damage to this state and its citizens. The alteration of the claims handling process implemented by this combination lowered the claims payment ratio (known as the payout to premium ratio) from a historic average of approximately seventy cents ($0.70) per premium dollar to approximately fifty cents ($0.50) per premium dollar, allowing these insurers to suffer the worst catastrophe in history while still earning sizable profits, as shown in the paragraphs below.

31.

**WHAT THE COMBINATION HAS DONE IN ITS OWN WORDS**

**Insurance industry shows increased profits despite Hurricanes Katrina and Rita**

ISO's website publishes "consolidated financial results" for the insurance industry. In 2005, it published that "net income and surplus both increased in 2005 even though catastrophe losses rose to a record high on a direct basis before reinsurance recoveries." (Insured property losses doubled from the previous year.)

32.

ISO's industry statistics after Hurricanes Katrina and Rita demonstrate the vast wealth accumulation by members of the combination. ISO released a statement on December 27, 2005, that "(t)he industry's net income and surplus increased despite record catastrophe losses. Including losses from Hurricanes Dennis, Katrina, Ophelia and Rita, direct insured property losses due to catastrophes through nine-months 2005 totaled $47.6 billion-nearly double the $27 billion in direct insured

- 9 -

property losses due to catastrophes through nine-months 2004, according to ISO's Property Claim Services (PCS)....These figures are consolidated estimates for all private property/casualty insurers based on reports accounting for about 96 percent of all business written by private U.S. property/casualty insurers."

33.

"Given the massive catastrophe losses absorbed by insurers in nine-months 2005, the increase in income and surplus during the first three quarters of the year is a testament to the underlying 'financial health' of the industry."

34.

Even more revealing is ISO's statement on profits or rate of return of the industry, enjoyed while Louisiana suffered. "Excluding $3.3 billion in special dividends one insurer received from an investment subsidiary, the industry's annualized return through nine-months 2005 was 8.5 percent-0.2 percentage points less than average annualized return through nine months from the start of ISO's quarterly records in 1986-2004."

35.

"Combining realized capital gains and net investment income, net investment gains rose $5.4 billion, or 15.3 percent, to $40.7 billion in the first nine months of 2005 from $35.3 billion in the first nine months of 2004."

36.

"The net loss on underwriting in nine-months 2005 amounts to 0.9 percent of the $309.9 billion in premiums earned during the period. The net gain on underwriting through nine-months 2004 amounted to 1.1 percent of the $309 billion in premiums earned during the period."

37.

"The combined ratio for nine-months 2005 was the second best combined ratio through nine-months since the start of ISO's quarterly records in 1986, surpassed only by the combined ratio through nine-months 2004."

38.

"The $20.4 billion increase in the industry's consolidated surplus in nine-months 2005 compares with a $22.3 billion increase in nine-months 2004. The increase in surplus in nine-months 2005 consisted of $28.8 billion in net income after taxes and $6.3 billion in new funds paid in, less

$0.4 billion in unrealized capital losses on investments, $9.6 billion in dividends to stockholders and $4.7 billion in miscellaneous charges against surplus."

39.

ISO's website describes its services as follows: "ISO Rating Service is the only system of its kind to provide these key features: Content supported by automated updates to loss costs, rules, and policy forms through ISOnet, inheritance-based technology, component-based, XML-driven design that facilitates interface with quote, submission, and policy-administration systems, rate-management tools that facilitate company maintenance, ongoing interpretation of the rating rules by ISO line experts and actuaries, and analysis of ISO updates."

40.

The unification of power and control was the inevitable result of the insurance industry's use of McKinsey advice and ISO tools of industry-wide claims standardization. These acts of enhanced power present a prima facie presumption of intent to restrain Louisiana commerce and to bring about monopolization of the industry. The power of the combination is actually greater than that of a monopoly. It is more akin to the power of a trust.

41.

## NEWS MAGAZINES AND CONGRESSIONAL TESTIMONY

According to Bloomberg Markets Magazine, companies have sharpened the use of technology in the past 20 years to help tighten claims payouts. Insurers, following McKinsey's advice on claims processing, have adopted computer programs with names such as Xactimate and IntregriClaim (used to value and underpay property damage claims). Insurers, as a part of the scheme, manipulate these programs to pay out as little as possible. They are designed to systematically underpay policyholders' claims.

42.

On April 11, 2007, Mr. J. Robert Hunter, Director of the Consumer Federation of America testified before the U.S. Senate Committee on Commerce, Science and Transportation that the Senate should investigate the collusive practices in the insurance industry and claims systems.

43.

He further testified that appalling abuses of consumers occurred in the wake of Hurricane Katrina. He stated that the revelations and settlements by New York Attorney General Eliot Spitzer

show that even the most sophisticated consumers of insurance can be duped into paying too much for insurance through bid-rigging, steering, undisclosed kickback commissions to brokers and agents and through other anti-competitive acts.

44.

He pointed out a startling blog from the President of the Association of Property/Casualty Claims Professionals, James Greer, posted on the web site of the Editor of the National Underwriter, that on the Mississippi Gulf Coast and in New Orleans, the insurance carriers "behaved as one," in taking a total hands off approach to indemnity.

45.

Mr. Greer further wrote that the animosity and litigation is about the failure of the insurance industry to keep its promise of indemnity.

46.

Mr. Hunter further testified that "Insurers have reduced their payouts and maximized their profits by turning their claims operations into 'profit centers' by using computer programs and other techniques designed to routinely underpay policyholder claims."

47.

**ADDITIONAL MEMBERS OF THE COMBINATION**

According to its website publicity release, "Insurance Services Company, ("ISO") acquired the assets of Xactware, Inc., the leading provider of estimation software and services for the property insurance, remodeling and restoration industries for an undisclosed amount. Xactware's customers now include 16 of the top 20 property insurers and approximately 80 percent of insurance repair contractors and service providers. During the record-breaking hurricane seasons of 2004-2005, Xactware's products were used to settle more claims than all of its competitors combined."

48.

"Founded in 1986, Xactware (www.xactware.com) is a technology services company specializing in the property insurance and restoration industries. Xactware's technology tools include software estimating solutions as well as powerful systems for replacement cost calculations, estimate tracking and real-time data trending."

49.

**THE COMBINATION'S REACH THROUGH ISO IN ITS OWN WORDS**

"ISO is a leading provider of products and services that help measure, manage and reduce risk.  ISO provides data, analytics and decision-support solutions to professionals in many fields, including insurance, finance, real estate, health services, government and human resources.  Clients use ISO's databases and services to classify and evaluate a variety of risks and detect potential fraud.  In the United States and around the world, ISO's services help customers protect people, property and financial assets.  For more information, visit www.iso.com."

50.

XactValue (very similar to ISO HomeValue), one of Xactware's products, advertises that it is "built on the Xactimate data engine-the industry leader in claims estimation."  It builds an ITV (insurance-to-value) calculator on top of the component-level system of Xactimate, which means that XactValue utilizes the same pricing methodology that Xactimate uses, and is also automatically updated with new price lists each quarter.

51.

Xactware further advertises "efficient" workflow solutions for underwriting such as: "Automatic recalculate valuations in the future-as prices change over time, you can recalculate upon renewal with a click of a button and automate the process for your entire book of business."

52.

Xactware advertises "convenient integration with other Xactware products: XactNet-utilize North America's largest claims assignment network to send and receive XactValue assignments. Now the same network available to claims professionals is available to underwriting professionals."

53.

XactAnalysis is advertised to allow network users to "view industry trends, track valuation volumes, manage training needs, and even view geographical mapping of valuation locations with the management reporting tool."

54.

XactAnalysis allows access to "a list of major third-party service providers already connected to the system and ready to receive assignments, line item auditing of estimates for identification of common scoping issues, graphical and text management reporting with automated alerts, quarterly industry trends for claims averages, key materials pricing, and labor rates, and real-time workflow

management and reviewing tools." (Emphasis added).

55.

XactAnalysis has an integrated "management tool" for "service providers, such as repair contractors, cleaning specialists and independent adjusters." It comes with the same Industry Trend Reports that assignment senders (e.g. insurance carriers and underwriters) have access to within XactAnalysis. Service providers can view the same details. It includes industry reports, customer surveys, and labor rate calculators, assignment tracking, with automatic notifications, action items, and geocodes and XactNet pricing.

56.

"XactAnalysis Quality Review is designed specifically for reinspection workflows and works in real time. It can be customized to meet your specific needs and data can be separated from other claims management programs.

With the XactAnalysis Quality Review program you can automatically assign reinspections, document findings, track progress, follow-up on recommended actions, and report on discovered trends."

57.

Xactware's website boasts XactAnalysis provides "powerful" Industry Trend Reports to its customers "at the click of a mouse." "Being the clear market leader for online property claims management puts Xactware in the unique position of providing essential reports that represent pricing trends for the entire industry. We can provide these reports because of the massive amount of claims data sent through our systems. That means you can have historical trends at your fingertips for the components that most affect your claims."

"The Industry Trend Reports will show you at-a-glance how prices have changed for key industry indicators such as lumber, drywall, and floor coverings over the past 10 quarters. You can track labor prices for individual trades, see how any pricing area compares to the rest of the country, or even compare what a small bathroom loss costs today versus last quarter or last year."

"Both XactAnalysis and XactAnalysis for Service Providers users have access to these Industry Trend reports, which are updated each quarter. Along with publishing these reports, qualified statisticians provide insight to these trends and identify the leading reasons for any increase or decrease."

"You can view Industry Trend reports for the entire country (USA or Canada) or drill down to a specific state, province or city. Some of the reports available include: composite reports for such items as carpet, drywall, lumber and roofing; retail labor reports; average estimate value reports; and basket of goods reports. You can also view newly added price list items and other quarterly enhancements made to our pricing database. When you are connected to XactAnalysis, you are connected to the entire industry!"

58.

On January 9, 2007, ISO announced "a major milestone today as its ISO ClaimSearch all-claims database surpassed 500 million industry claims. The ISO ClaimSearch system is the property/casualty insurance industry's first resource for evaluating claims histories and detecting claims fraud."

Richard Boehning, senior vice president at ISO has stated, "ISO has worked hand-in-hand with the industry to build and enhance the all claims fraud-fighting resource over the past few years....We're pleased to have reached this milestone in the size of the database-which is just one measure of the improvement in the quality of the data we provide the industry for claims handling and fraud detection....Insurers representing nearly 95 percent of the industry in premium volume use ISO ClaimSearch for day-to-day claims handling and evaluation. Hundreds of thousands of claims and claim updates are processed daily. And each day, tens of thousands of queries are run against the database by insurers' investigators, law enforcement personnel, National Insurance Crime Bureau investigators and state fraud bureaus. The system now receives more than 48 million claims annually."

Vincent Cialdella, vice president of ISO ClaimSearch has stated, "We're pleased that the industry has supported the data-expansion and enhancement program so enthusiastically by converting to our enhanced data-reporting format and submitting larger volumes of claims...."

59.

"....In addition to expanding the database, ISO has also enhanced the system's processing and claims-handling resource by integrating fraud-detection capabilities, such as claim scoring and data analysis and visualization. ISO has also added an integrated, web-based case-management function."

60.

"ISO ClaimSearch serves thousands of insurers, 24 state workers compensation insurance

funds, 650 public and private self-insured organizations and 480 third-party administrators (TPAs)..."

61.

## THOSE WHO ARE NOT A PART OF THE COMBINATION ARE DRIVEN OUT OF BUSINESS

Frank J. Coyne, Chairman, President and Chief Executive Officer of ISO said, "Spurred by intensifying competition, breakthroughs in analytics are transforming dynamics in insurance markets. Sophisticated insurers able to harness large volumes of high-quality data to drive decision making all along the value creation chain can look forward to a long and prosperous future. But insurers unable to keep up in the intellectual and technological arms race face a grim prognosis, according to an industry leader.

In just a decade and a half, approximately a third of the insurers serving the United States vanished as escalating competition ate into top-line revenue growth and bottom-line profitability. But it isn't just the intensity of competition that's changing,...The nature of competition is changing too, as advances in predictive modeling and other analytical techniques enable leading insurers of all sizes to target their marketing, underwriting and pricing as never before."

62.

Coyne also noted the application of predictive modeling and other advanced analytics to Main Street commercial lines business. Coyne states, "With premiums for business owner's policies or BOP business averaging approximately $1,500, spending significant sums on painstaking underwriting is out of the question....But, with the right technology, it only takes a junior underwriter seconds to enter a few facts from a policy application and get a score that indicates whether the risk should be underwritten."

63.

Additionally, Coyne stated, "Predictive modeling and intelligent database matching now enable insurers to spot flawed information and stop premium leakage;" i.e., the McKinsey principle at work.

64.

## SECRET PRICE MANIPULATION IS MADE EVEN EASIER

ISO coordinates virtually every aspect of insurance industry business, from risk assessment

- 16 -

and underwriting, to policy form creation and administration, to every aspect of claims handling.

65.

ISO individually, and through its subsidiary Xactware, Inc., employed numerous uniform programs and databases to achieve the conspiracy, including but not limited to PushPin, HomeValue and Xactnet.

66.

ISO PushPin contains specific and detailed data on key building features for more that 50 million residential properties in the United States. Agents, underwriters, and inspectors can enter additional property information into ISO HomeValue. By employing ISO HomeValue to gather and maintain property data, insurers were able to manipulate estimates of an individual property's catastrophe loss potential, in addition to its replacement cost.

67.

ISO's HomeValue is a property replacement valuation system that enables insurers and their agents to make estimates of the replacement cost of residential properties in the event of total loss. By providing a means to justify a full replacement value for property policies, ISO HomeValue enabled the manipulation of the amount of replacement coverage on a home, thereby underwriting profitability. The web-based interface streamlines the uniform manipulation of the replacement cost estimation process. It was integrated with in-house and third-party applications, as well as with a wealth of data sources from ISO.

68.

As another example, XactNet is used by insurance carriers and other professionals to send requests for estimates and services to adjusters, contractors and service providers. Once a request is received, estimates are returned over the same network. Estimates sent over XactNet can contain line items, photos, notes, audio files and floor plans. XactNet is also used to assign and receive valuation estimates for underwriters.

69.

After Hurricanes Katrina and Rita, Defendant Insurers adjusted claims filed by their insureds in the State of Louisiana.

70.

Defendant Insurers, individually and collectively, and/or others acting on its behalf, inspected

the property and calculated/adjusted the monetary value of the damage or loss to immovable property by using computer programs called Xactimate and IntegriClaim.

71.

Xactimate and IntegriClaim are estimating software programs designed for adjusting/estimating damaged property replacement cost (to which a depreciation amount is applied if actual cash value is the proper amount to be paid under the contract).

72.

Xactimate or IntegriClaim is used by the insurance claims adjuster entering in the damaged immovable property component parts (e.g. drywall or siding) and the size of the damaged property (e.g. square feet or linear feet) and the program applies a pre-determined price for that damaged item and calculates that "line item's" replacement cost.

73.

The "line item" prices purportedly include labor, materials and other necessary items for each repair (e.g. nails, caulk, etc.).

74.

Upon information and belief, claims adjusters are pressured or required by the Defendant Insurers to accept the pricing database prices in the estimates, and any supplements, they write.

75.

Upon information and belief, if the claims adjuster does not use the database price, they risk their submission being flagged by the insurance carrier's claim examiner and "kicked back" or rejected, thus, delaying the adjuster's payment.

76.

The line item prices used by the Defendant Insurers are, upon information and belief, consistently below the lowest market price.

77.

An agreement, combination or conspiracy between all defendants, and other unnamed competing insurance companies, existed, at all material times herein, to horizontally fix the prices of repair services utilized in calculating the amount(s) to be paid under the terms of Louisiana insureds' insurance contracts with insurers for covered damage to immovable property.

78.

The maker of the Xactimate program, Xactware, is a wholly owned subsidiary of Insurance Services Office, Inc. (ISO), which also acts as an information repository and exchange for the insurance industry including, upon information and belief, Defendant Insurers.

79.

Defendant Insurers set up Xactimate and/or IntegriClaim as ostensible independent and objective benchmark(s) for reasonable replacement cost pricing, which they can rely on for the payment of proceeds due under the policy. However, these insurers, through coordination with each other and Xactware and/or MSB, intentionally devalue the market price in order to underpay their policyholders and/or artificially deflate, or attempt to deflate, construction and repair costs in the affected market.

80.

The repair services market that was the target of the price fixing was the repair/restoration services being provided in Louisiana, immediately after Hurricanes Katrina and Rita through to today.

81.

Upon information and belief, from on or about January 1998 to July 1999, Farmers received permission to visit Fireman's Fund, Royal, USF&G, AMICA, State Farm, Allstate, American Family, Travelers, USAA, Hartford; a staff of people actually went to these companies, sat down with their claims personnel and discussed their strategies, their technologies, and where they were headed. As a direct result of those meetings, in December 1999, Farmers mandated the use of the Xactimate program for all property damage claim adjustments, where previously they had no mandated adjustment process.

82.

Upon information and belief, the adoption and coordinated use of the Xactimate program and/or the IntegriClaim program was a direct result of the collusion between and among the Defendants.

83.

State Farm has stated under oath that "Xactware generates and issues the price lists to State Farm. However, State Farm invests time and money reviewing and modifying the Xactware Price Lists prior to using the lists to adjust claims. Within each region, at least one Pricing Specialist

contacts and/or surveys suppliers in the region for current pricing issues...the New Orleans price list was updated a number of times per quarter from 2005 through 2007."[emphasis added.]

84.

However, State Farm's price list LANO5F5D3, active on or about November 15, 2005, upon information and belief, was identical to Traveler's price list LANO2S52, active on or about November 15, 2005; with each price list containing over 10,0000 line items, this is a statistical impossibility without collusion.

85.

State Farm and other insurers submitted settled claim amounts to Xactware which were knowingly manipulated to be lower than the market price.

86.

Allstate and other insurers also manipulated IntegriClaim price lists and software to output prices lower than the market price with the full knowledge of MSB.

87.

Upon information and belief one primary mechanism for the creation of these lower settled claims amounts was through the use of preferred contractors.

88.

Each insurance company uses a different name for their preferred contractor program, some examples are: USAA's Property Direct Repair Program (PDRP), Liberty Mutual Insurance Group's Contractor Network Referral Program (CNRP), State Farm's "Premier Service" plan, and Allstate's Quality Vendor Program (QVP).

89.

These contractors are provided a higher volume of business referrals from the insurance company in exchange for following the mandates of the insurance company.

90.

For example, one such mandate for preferred contractors with State Farm is that building materials can only be sought at selected large home repair retailers, who, upon information and belief, have contracts with State Farm for discounts of twenty percent (20%) or more.  Upon information and belief, State Farm pays directly for these building supplies and the preferred contractor never knows the actual building materials cost.

91.

The preferred contractors, at a minimal overhead and profit margin dictated by the insurer, then complete the repair work for the insurer's estimated cost.

92.

This allows the insurance company to justify the below market pricing it submits to Xactware or MSB for input into the settled claims amount database.

93.

Upon information and belief, Xactware and MSB sell their estimatics programs updated with pricelists created in part by the tainted/biased data being submitted by the insurance companies and enjoy sizeable profits therefrom.

94.

Upon information and belief, at all material times, Xactware and MSB had knowledge that the tainted data was being submitted by the Defendant Insurers to intentionally deflate the value of the damaged property payments owed to Louisiana insureds.

95.

Despite this knowledge, Xactware and MSB, upon information and belief, conspired with Defendant Insurers to include this data for input into the pricing databases, thus skewing the output prices to below the actual market.

96.

Current "settled claim amounts," and their component prices, are shared by the Defendant Insurers through a free program that comes with the Xactimate program: Xactanalysis or Xactanalysis for Service Providers (SP).

97.

Xactanalysis and Xactanalysis SP contain a function called "Industry Trend Reports."

98.

Defendant Insurers employ the "Industry Trend Reports" to share the current prices being submitted by competitors, and thus, coordinate the horizontal price-fixing suppression, or attempted suppression, of the overall market in repair services at virtually every geographic level and price component.

99.

Additionally, Defendant Insurers employ Xactanalysis with the ability to "drill down to" and monitor/compare the individual claim adjuster's payout performance, and thus, ensure compliance with the pricing levels set by the company.

100.

The repair services market that was the target of the current price sharing and usage was the repair/restoration services being provided in Louisiana, immediately after Hurricanes Katrina and Rita through to today.

101.

Defendant Insurers' use of the current price sharing through the "Industry Trend Reports" creates an anti-competitive means of coordinating horizontal price-fixing which is unreasonable and cannot be justified when weighed against the purported informative justification for the "Trend Reports" and the minimal pro-competitive impact of allowing comparison of the claims paid out versus the overall industry trend.

102.

The market repair/restoration prices in Louisiana increased approximately 100% from pre-storm prices by December 2005, and full rebuilding prices increased by approximately 50%.

103.

Defendant Insurers' price lists only increased approximately 15-20% from pre-storm prices by December 2005. For instance, the Xactimate price list used by Travelers for "R&R drywall, hung, taped, floated ready for paint" line item was $1.41/sq. ft. (Price list: LANO2B41, July 21, 2005), and by November-December 2005 Travelers' price list had increased to $1.69/sq ft. (LANO2S52) an increase of only 20%. In January 2006, IntegriClaim's price for removing and replacing drywall was less than one dollar ($1.00) per square foot.

104.

The Defendant Insurers' active collusion with one another and others in using tainted pricelists is a co-conspiracy within the meaning of La C.C. art. 2324.

105.

The reduction in the amount paid out thereby reduced the payout and increased the profits of

the Defendant Insurers, despite the losses caused by Hurricanes Katrina and Rita.

106.

Setting the payout amount lower than it would be if market prices were paid out would be detrimental to an insurance company's competitiveness if it were not for the combined and coordinated use of the same intentionally deflated prices by competitors, because an insured would not seek renewal of their policy if other insurers paid more for covered damage than another insurer with substantially the same rate.

107.

Additionally, Defendant Insurers have actively coordinated and/or conspired their actions through various organizations and associations, with regular conferences and summits, including, but not limited to: Xactware's Annual Industry Summit, Property Loss Research Bureau's (PLRB) Claims Conference & Insurance Services Expo, Regional Adjuster Conferences, and Large Loss Conference; The Insurance Summit (only senior executives are invited); The National Underwriter Company's annual America's Claims Event (ACE): Property Insurance Report National Conference; the annual ACCORD Conference; The Property Casualty Insurers Association of America's Executive Roundtable Seminar, ACIC General Counsel Seminar, Information Technology Conference, and their Annual Meeting; The American Insurance Association; Insurance Information Institute; ISOTECH conference; and Insurance Services Office, Inc. (ISO) which until 1994 was under the direct control of a partnership of insurers and in August 2006 purchased Xactware, Inc.

108.

Upon information and belief, all of the above referenced insurance companies and others consulted with McKinsey & Co. between 1988 and the present, intentionally implementing the scheme described herein to their claims handling process.

109.

Upon information and belief, McKinsey & Co. consulted with these companies and was the driving force to alter the paradigm of the insurance industry from one in which the claims handling process was a quasi-fiduciary function to an adversarial one meant to limit claims payouts in order to increase profits.

110.

Upon information and belief, this new way of conducting claims processing resulted in

substantial increases in profits for those companies.

111.

Upon information and belief, one of the principal directives of McKinsey & Co. was the use of computer software to standardize and control claim payments.

112.

Upon information and belief, McKinsey & Co., as agent consultants for these companies, promoted the industry-wide adoption of the estimatics programs Xactimate and/or IntegriClaim with the intended goal of holding down claim payouts through horizontal price-fixing, thus increasing the profits of each company involved.

113.

The purpose of the combination and conspiracy was to depress the amount paid out under the terms of the insurance contracts to below market prices and deprive Louisiana insureds of the actual cash value and/or replacement value of the damaged property.

## PRICE-FIXING ANTI-TRUST VIOLATION

114.

Petitioner repeats and realleges all preceding paragraphs.

115.

Defendants' intentional collusion in suppressing payments to Louisiana insureds for damages caused to their property over many years, including, but not limited to, property damaged from Hurricanes Katrina and Rita, violates La. Rev. Stat. 51:121, et seq.

116.

The payment of actual cash value, replacement value, and/or market value for repair services within the State of Louisiana is commerce within the meaning of La. Rev. Stat. 51:121.

117.

Defendants' intentional acts to depress the payments of the actual cash value, replacement value, and/or market value through the use of the estimatics programs Xactimate and/or IntegriClaim is a conspiracy within the meaning of La. Rev. Stat. 51:122(A).

118.

Defendants' intentional acts to depress the payments of the actual cash value, replacement value, and/or market value through the use of estimatics programs substantially lessens competition

within the meaning of La. Rev. Stat. 51:122. In particular, the Insurers, by, through and with their partners and co-conspirators, ISO, McKinsey, Xactware, and MSB, set up Xactimate, IntegriClaim and/or other similar ISO programs as an ostensible "independent" and "objective" benchmark for reasonable replacement cost pricing, which they can rely on for the payment of proceeds due under the policy. In truth, however, these Insurers, (together with ISO, McKinsey, Xactware and MSB), through Xactimate and/or IntegriClaim, intentionally devalue the "market price" in order to underpay their policyholders and/or artificially deflate construction and repair costs in the affected market. Plaintiffs further show that:

A.   The Insurers directly negotiate with and provide for the payment of contractors and others, and, in such regard, are effectively the purchasers of replacement, repair, and/or construction goods and services, and are attempting to, and succeeding in, artificially setting the market for such goods and services too low.

B.   In the alternative, and to the extent that the Insurers are considered the sellers of insurance coverages: In the traditional price-fixing case, the defendants collude to set a price for fairly identical goods or services. The purchasers are forced to pay too much for that good or service. Here, the collusion is to decrease the value of the good or service. But the effect is the same: The purchaser pays too much for the good or service (*i.e.* the coverage afforded under the policy). While, in the short term, minimizing the pay-out on a claim would seem to be in the insurers' interest, from a competitive point of view, it is not in the insurers' interest, because people won't purchase or renew policies if they can get more goods or services (*i.e.* coverage) for their money somewhere else.

C.   While it could be argued that insurers only "compete" for premium dollars at the time a policy is initially purchased, the Insurers have admitted that there is competition on the claims / pay-out end as well, by taking the position in legal proceedings that claims manuals and other policies are proprietary trade secrets which must be protected by court order, to prevent competitive injury.

D.   Additionally, Insurers actively coordinated their actions through various companies, organizations and associations.

119.

The State of Louisiana and its citizens were substantially injured, both financially and emotionally, by having to pay their own monies the repair costs that should have been paid by their insurers and/or the delays in rebuilding/repairing and/or the necessary litigation in securing the amounts owed under the contracts with defendant insurers.

120.

There is a factual connection between the defendants' actions and the injuries of the State of Louisiana and its citizens.

121.

The policies of the antitrust laws and their system of protection extend to the State of Louisiana and its citizens. Those policies include the court's plain duty to enforce the law, ever mindful of the wrong inflicted on the public resulting from crushing out individual rights using methods of enhanced power that flows from combinations, and the legislative intent to prevent such unreasonable restraints of trade and formation of monopolies, using application of the statutes to the facts using the reasonable man standard of appraisal found in tort law. The statutes were intended to be interpreted in an unbalkanized manner, so that in no way or by no means could public policy be evaded. La. R.S. 122 forbids all means of monopolizing trade and R.S. 51:123 forbids all restraints of trade by any attempt to monopolize evaluated in light of R.S. 51:122. When *any* part of trade becomes affected by a restrain, a monopoly has occurred or is in developing stages.

122.

Under applicable law, insurers are held to the indemnity and fiduciary duty standards, both of which they breached.

123.

The State of Louisiana and its citizens are entitled to the relief of disgorgement of illegal profits, treble damages and injunctive relief.

### JURY DEMAND

The State of Louisiana prays for a jury to decide all issues raised herein.

### PRAYER FOR RELIEF

WHEREFORE, the Louisiana Attorney General prays that:

A.      Summons be issued to Defendants to appear and timely give an answer;

- 26 -

B.    After due delays and legal proceedings, judgment be rendered in favor of the State of Louisiana and against Defendants for all damages asserted and proved, including, but not limited to, treble damages, reasonable attorneys' fees, and costs;

C.    Injunctive relief;

D.    Any and all equitable, declaratory, and general relief as this Court deems fit.

Respectfully Submitted:

**CHARLES C. FOTI, JR.**, La. Bar No. 05784
**Attorney General State of Louisiana**
Louisiana Department of Justice
1885 N.3rd Street
Baton Rouge, LA 70802
Telephone:    (225) 326-6467
Facsimile:    (225) 326-6499

And

**JOSEPH J. McKERNAN**, La. Bar No. 10027
*McKernan Law Firm*
8710 Jefferson Highway
Baton Rouge, LA 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

And

**RUSS M. HERMAN**, La. Bar No. 6819
**STEPHEN J. HERMAN**, La. Bar No. 23129
**BRIAN D. KATZ**, La. Bar No. 24137
**SOREN E. GISLESON**, La. Bar No. 26302
**JOSEPH E. CAIN**, La. Bar No. 29785
*Herman, Herman, Katz & Cotlar*
820 O'Keefe Ave.
New Orleans, LA 70113
Telephone:    (504) 581-4892
Facsimile:    (504) 561-6024

And

**J. ALEX WATKINS**, La. Bar No. 29472
**T. CAREY WICKER, III**, La. Bar No. 13450
*Capitelli & Wicker*
1100 POYDRAS STREET
2950 ENERGY CENTRE
NEW ORLEANS, LA  70163-2950
TELEPHONE: (504) 582-2425
FACSIMILE:   (504) 582-2422

And

**MARK P. GLAGO**, La. Bar No. 25395
*Glago Law Firm, LLC*
1100 POYDRAS STREET
2950 ENERGY CENTRE
NEW ORLEANS, LA  70163-2950
TELEPHONE: (504) 599-8666
FACSIMILE: (504) 599-8699

## ATTORNEYS FOR STATE OF LOUISIANA AND ITS CITIZENS

<u>PLEASE SERVE:</u>

**ALLSTATE INSURANCE COMPANY**
Agent For Service of Process:
LOUISIANA SECRETARY OF STATE
8549 United Plaza Blvd.
BATON ROUGE , LA 70809

And

**LAFAYETTE INSURANCE COMPANY**
Through Agent for Service of Process:
LEO F. WEGMANN JR.
2800 Veterans Blvd., Suite 253
Metairie , LA 70002

And

**STATE FARM FIRE AND CASUALTY COMPANY**
Agent For Service of Process:
LOUISIANA SECRETARY OF STATE
8549 United Plaza Blvd.
BATON ROUGE , LA 70809

And

**USAA CASUALTY INSURANCE COMPANY**
Agent For Service of Process:
LOUISIANA SECRETARY OF STATE
8549 United Plaza Blvd.
BATON ROUGE , LA 70809

**FARMERS INSURANCE EXCHANGE**
Agent For Service of Process:
LOUISIANA SECRETARY OF STATE
8549 United Plaza Blvd.
BATON ROUGE , LA 70809

And

**STANDARD FIRE INSURANCE COMPANY**
Agent For Service of Process:
LOUISIANA SECRETARY OF STATE
8549 United Plaza Blvd.
BATON ROUGE , LA 70809

<u>PLEASE ISSUE SUMMONS FOR LONG ARM SERVICE:</u>

**XACTWARE, INC.**

- 28 -

1426 East 750 North
Orem, Utah 84097

And

**MCKINSEY & COMPANY**
55 E. 52nd St., 21st Fl.
New York, NY 10022

And

**INSURANCE SERVICES OFFICE, INC.**
545 Washington Boulevard
Jersey City, N.J. 07310-1686

And

**MARSHALL & SWIFT/BOECKH, LLC**
915 Wilshire Blvd Ste 800
Los Angeles, CA 90017-3488