```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   STATE OF LOUISIANA, EX REL.      CIVIL ACTION NO. 07-9409
                                      NEW ORLEANS, LOUISIANA
 6      VS.                           WEDNESDAY, DECEMBER 17, 2008
                                      10:00 A.M.
 7   ALL STATE INSURANCE CO, ET AL.   SECTION "A"

 8

 9
                                  **MOTIONS**
10                 BEFORE THE HONORABLE JAY C. ZAINEY
                    UNITED STATES DISTRICT COURT JUDGE
11

12
     A P P E A R A N C E S:
13
     FOR THE PLAINTIFFS,        CAPITELLI & WICKER
14   LOUISIANA STATE:           By: James A. Watkins, Esq.
                                Energy Center
15                              1100 Poydras Street, Suite 2950
                                New Orleans, Louisiana 70163
16                              (504)582-2425

17


18   FOR THE DEFENDANTS,        SONNENSCHEIN, NATH & ROSENTHAL
     ALL STATE INS. CO.:        By: Richard L. Fenton, Esq.
19                              7800 Sears Tower
                                233 South Wacker Drive
20                              Chicago, Illinois 60606
                                (312) 876-8000
21

22
     FOR STATE FARM FIRE        STONE, PIGMAN, WALTHER, WITTMANN, LLC
23   & CASUALTY CO.:            By: Wayne J. Lee, Esq.
                                546 Carondelet Street
24                              New Orleans, Louisiana 70130
                                (504) 581-3200
25
```

```
 1
    **APPEARANCES CONTINUED:**
 2

 3

 4

 5

 6
    FOR McKINSEY & COMPANY,      LISKOW & LEWIS
 7  INC., UNITED STATES:         By:  James Alcee Brown
                                 One Shell Square
 8                               701 Poydras Street, Suite 500
                                 New Orleans, Louisiana 70139
 9                               (504) 581-7979

10

11

12

13

14

15

16

17

18

19

20  REPORTED BY:                 VICTOR D. Di GIORGIO, CCR
                                 OFFICIAL COURT REPORTER
21                               500 Poydras St., Room HB 406
                                 New Orleans, Louisiana  70130
22                               (504) 589-7782

23
    Proceedings recorded by mechanical stenography.
24  Transcript produced by computer aided transcription.
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                  (WEDNESDAY, DECEMBER 17, 2008)
 3                  (10:00 A.M.  -  MORNING SESSION)
 4                       (COURT CALLED TO ORDER)
 5          THE DEPUTY CLERK:  All rise.
 6          THE COURT:  Good morning.
 7          Please be seated.
 8          THE DEPUTY CLERK:  Civil Action 07-0409.  State of
 9  Louisiana versus Allstate Insurance Company, et al.
10          Counsel making argument, please make your appearances,
11  please.
12          MR. WATKINS:  Alex Watkins on behalf of the State, Your
13  Honor.
14          THE COURT:  All right, Mr. Watkins.  Thank you
15          MR. LEE:  Wayne Lee here on behalf of State Farm, but
16  presenting arguments on behalf of all the defendants, Your
17  Honor.
18          THE COURT:  Great.
19          MR. FENTON:  Rick Fenton, Your Honor, on behalf of
20  Allstate presenting arguments on behalf of all defendants on the
21  motion to sever.
22          THE COURT:  All right, sir.
23          MR. BROWN:  Your Honor, James Brown on behalf of
24  McKinsey and Company.
25          THE COURT:  Very good.  Thank you very much.
```

1                There are a number of other attorneys in Court.  Just
2    make sure that you sign in with James.  I believe most of you if
3    not all of you have already done so, but before you leave,
4    please do so.
5                Let me get Mr. Watkins and Mr. Lee up to the podium.
6                As we did in the last oral argument, I'm just going to
7    ask specific questions, then I'll give each party the
8    opportunity to sum up at the end.
9                Mr. Watkins, let's start with you.
10               You're representing the State, is that correct?
11               MR. WATKINS:  Yes, sir, and I am representing them pro
12   bono.
13               THE COURT:  All right, sir.  Thank you.
14               In reading the Twombly case it seems to me that the
15   plaintiffs in that case allege that the defendants had engaged
16   in certain parallel conduct unfavorable to competition and the
17   complaint contained no facts suggestive of an agreement amongst
18   the defendants.  That seems to be very similar to our case.
19               Do you agree that Twombly holds that?  And do you agree
20   that that is in fact what's in our case, or if not, how are they
21   distinguishable?
22               MR. WATKINS:  I would suggest, Your Honor, that
23   Twombly's holding does suggest that it does state that
24   allegations that are wholly supported by any allegation of
25   parallel conduct requires further facts beyond simply an

1 accusation of parallel conduct, and Twombly was a consolidation
2 or an answer to a split in the circuits as to you just need
3 parallel conduct accusation, or do you meed plus factors plus
4 the parallel conduct?  And the Court actually took it one step
5 further and suggested that facts, specific facts, and the Court
6 specifically noted there were no facts which supported an
7 accusation of a conspiracy, were alleged in that case and tried
8 to explain, you know, you do need a fact at least suggestive of
9 a complaint beyond simply an accusation of parallel conduct.
10          THE COURT:  Right.  So where in your complaint does it
11 allege additional facts?
12          MR. WATKINS:  I would point the Court to at least one
13 that I can think of one off the top of my head was the Farmers
14 Group Meeting or meetings with a number of the defendants
15 wherein they discussed claims strategies, technologies and where
16 they're headed that directly resulted in the use of the
17 Xactimate program and it's not in the petition, but a number of
18 other activities as well.
19          THE COURT:  Well, how does that Emergency Rule 22
20 issued by the Insurance Commissioner fit into all this?  Did he
21 not in fact encourage the insurers to use the processing
22 software models so that the claims could be expedited?
23          MR. WATKINS:  The claims handling software has been
24 adopted by the insurance industry for many years, and Rule 22
25 specifically also noted there was a significant discrepancy

1  arising between the initial payments being offered by the
2  insurance companies to their insureds and what the contractors
3  were telling the insureds it was going to cost.
4            It is evident by the Insurance Commissioner's own
5  directive that he was unaware of the very specific nature of the
6  way in which those prices were set and the way that program was
7  used, particularly the pricing in it, but I think the Insurance
8  Commissioner was unaware of the why the insureds were being
9  underpaid, and it is the accusation in this pleading and other
10 pleadings that was a direct result of this program in the
11 manipulation of this program by insurance companies.
12           THE COURT:  Mr. Lee.
13           MR. LEE:  Your Honor, I think I would first start off
14 with I disagree with counsel's description of what the decision
15 in Twombly stands for.  It stands for the proposition that not
16 that you just have to give facts, but the facts have to have a
17 particular inference.  You have to have facts from which you can
18 determine whether there's a greater tendency to exclude
19 independent-self interested conduct as an explanation for the
20 defendants parallel conduct, so if you've got people that are
21 doing the same kind of thing if there is a reason for that that
22 would be a sustainable by independent-self interested reasoning
23 then that is not an indication of a conspiracy, and if you can't
24 cross that threshold then you don't have a viable claim.  And,
25 Your Honor, that specifically what has been dealt with in at

1  least three cases that have been before this Court, the Schafer
2  case, the Mornay case, and the Muzzy case.  First Judge Duval,
3  and then Magistrate Knowles and affirmed by Judge Africk.  They
4  said this is basically the same complaint.  It doesn't cross
5  that threshold.
6              THE COURT:  I was going to get into that next.
7              And how is this case in this Court distinguishable from
8  those other two cases, Schafer and Mornay?
9              MR. LEE:  Your Honor, I don't think they are.
10             THE COURT:  Because I don't think they are
11 distinguishable.
12             MR. LEE:  I don't think they are, because the
13 allegation that he's talking about right now with regard to, you
14 know, the Farmers visits to the companies that was part of the
15 complaint that was asserted in the Mornay case.  That was all
16 presented to Judge Duval at that time.
17             THE COURT:  Oh, no, I agree, that's why I'm asking Mr.
18 Watkins, how are they distinguishable?
19             MR. WATKINS:  I would first distinguish it as the
20 Schafer and Mornay -- first the Schafer case was pre-Twombly, so
21 it contained parallel conduct allegations coupled with the plus
22 factors.  But more importantly, the Schafer and Mornay cases are
23 directly addressing a symptom.  The Attorney General case is
24 directly addressing the entire illness, and that would be the
25 Cartel formation and it's -- the price fixing and the

1  utilization of these software programs is just a part of a much
2  larger issue and that is the formation of a cartel, a hardcore
3  cartel to manipulate the entire insurance industry the way it's
4  run, and this runs from automobile claims through homeowner
5  claims and it's over a much more longer period of time, and the
6  Fifth Circuit recognized that in the appellate decision.  It
7  runs much longer than simply Hurricane Katrina.
8         Hurricane Katrina was the focus of everyone because
9  there were so many claims and the amount of money involved were
10 substantial, but the attorney general case addresses an issue
11 that is much broader than the Schafer or Mornay case.
12         THE COURT:  Mr. Lee.
13         MR. LEE:  Your Honor, the allegations are
14 indistinguishable.  What they're alleging is the nature of the
15 conspiracy is identical to what they've alleged before.  The
16 facts that they've cited is the support for or virtually
17 identical.  They've thrown along the way in this complaint a few
18 more quotes from web sites we really don't address the issues
19 and pricing issues that are presented here, but indeed they are
20 supported and indicative of decisions by insurance companies to
21 do things that are good for their companies.  They identify ISO
22 as a company that provides services and information that helps
23 people to monitor for fraud and to create efficiencies in the
24 handling of their claims.  Now, those are the kind of things
25 that indicate a conspiracy to fix prices.

1           The Schafer decision was assuredly decided by Judge
2 Duval on the basis of Twombly, and that complaint was analyzed
3 on the basis of Twombly. They tried to build up the complaint
4 further in the Mornay case, and again he looked at the
5 distinctions that they tried to make and found that those
6 distinctions did not get them across the threshold. There is
7 nothing factual that they presented.
8           Your Honor, we shouldn't loose sight of what this is.
9 These are estimating tools, and as we've said in our motion to
10 dismiss, you know, this isn't even in the context of an
11 antitrust complaint or antitrust problem. We've got people that
12 -- insurance companies that are in the market where they provide
13 insurance, their are rates are determined by the Insurance
14 Commissioner. The allegation is not that there's some
15 conspiracy to fix the pricing of the product that the insurance
16 companies present. What they say is you've under calculated the
17 damages on insurance claims. Well, you know, what the Emergency
18 Order 22 says, "Is you should use these tools as a starting
19 point".
20           THE COURT: You see that's the problem that I had, Mr.
21 Watkins. You know, on the one hand you're alleging conspiracy
22 amongst the insurance carriers that they got together and did
23 all this, but then on the other hand you had the Insurance
24 Commissioner himself urging them to get together just so that
25 they can expedite claims. I'm not suggesting they did it in a

1  great fashion, but, you know, we're here on these antitrust
2  allegations made by you guys and that's why I'm having a real
3  difficult time in light of this Emergency Rule 22.
4            Mr. Brown, do you have anything that you would like to
5  add to this?  I think Mr. Lee has done a sufficient job on
6  behalf of all the defendants.
7            MR. WATKINS:  I would like to point out in the Mornay
8  oral argument, Judge Duval asked a very similar question, and I
9  don't remember Steve Herman's response, but I can tell you
10 Judge Duval's response was he felt that ISO's ownership of
11 Xactware was another substantial factor, but he specifically
12 said that ownership occurred after the incident that is the
13 subject of the Mornay case, and so it did not play into that.
14 That is not the case in this case.
15           THE COURT:  Okay.  Thanks.  Mr. Brown.
16           MR. BROWN:  Your Honor, I think my co-counsel's doing a
17 fine job on behalf of the insurance companies.  I represent
18 McKinsey, which is a mere consultant.
19           The only point I would like to make, which setforth in
20 our briefs, is that there is no reported decision holding a mere
21 consultant liable in an antitrust price-fixing conspiracy.  The
22 only case that we found where somebody tried to do it, the judge
23 summarily dismissed the claim as a matter of law finding that
24 the consultant had no motivation to conspire and was in no
25 position to conspire, and that's certainly the case here.

1  McKinsey was a consultant, it not a competition in the insurance
2  market.  And I'm going to let my co-counsel speak for the rest
3  of case.
4           THE COURT:  You're pretty comfortable with his argument
5  so far?
6           MR. WATKINS:  I am indeed.
7           THE COURT:  Okay.  Let's address that though, because
8  I couldn't find any cases either.  I mean, I see what you've
9  alleged.  How does that fit into this?
10          MR. WATKINS:  A consultant has every opportunity and
11 right, and, you know, that's their job to go around and consult
12 with companies, but they step over a line particularly an
13 antitrust line when they begin to advise on the use of Xactimate
14 programs in order to facilitate lowering the amount that's being
15 paid on claims, and they're doing it in consultation with a
16 number of insurance companies at the same time, when these
17 programs are being utilized to pay out for repair services.  And
18 I would point out Judge Duval's ruling in Schafer eliminated
19 essentially all of the elements in a favorable way for the
20 plaintiffs except for the question of conspiracy, and so he said
21 insureds have an antitrust standing and antitrust injury, and
22 that the only real question was whether or not there was a
23 conspiracy, and that the parallel conduct allegation and plus
24 factors were insufficient under Twombly, which, you know, we
25 didn't even have Twombly to look at when we wrote the original

Case 2:07-cv-09409-JCZ-ALC   Document 100   Filed 01/08/09   Page 12 of 19
12

1 complaint in Schafer.

2    THE COURT:   But you've to live with that now though.

3    MR. WATKINS:  Yes, sir.

4    THE COURT:  Mr. Lee, any final remarks?

5    MR. LEE:  Yes, Your Honor.  One thing in response to

6 counsel's comments about ISO and the timing and the fact that

7 they're saying that there's a continuing conspiracy.

8    The point here, Your Honor, is Judge Duval first

9 recognized, you know, that they did not get over the threshold

10 -- the acquisition of Xactware by ISO occurred after the alleged

11 conspiracy begin, and there's no question.  They have alleged

12 that this was going on from the beginning of Katrina at least

13 and going forward, and there's nothing in their allegations that

14 indicates that after ISO acquired Xactware that anything

15 different happened, that there was any change, that the

16 conspiracy somehow morphed, or -- all they said is it came in.

17 Now, they've tried to make that, you know, amass that as

18 somehow, okay, we've now got something massive and big, but the

19 fact is all you've got is an acquisition of a company and a

20 product that's out there that's being used not only by the

21 insurance companies but by contractors all over the United

22 States, and what's the Insurance Commissioner saying?  "You

23 should use that and others as well".  Marshall & Swift/Boeckh is

24 another?  One that's being used.  It's kind of hard to have a

25 conspiracy to fix prices when you've acknowledged that you've

1  got different estimating tools that are being used out there and
2  the tools are different and the estimates are different and
3  they're only being used as a starting point just as the
4  Commissioner has suggested.
5          There's no allegation that the insurance companies are
6  refusing to even consider supplemental payments when a
7  contractor comes in with a problem.  There is no price fixing at
8  all in this issue.  We aren't buying anything.  We've given an
9  estimate of damages, and we've said, you know, "If you've got
10 more information, come back", but there is no price fixing.
11 There is no antitrust conspiracy.  There is no harm to
12 competition.
13         MR. WATKINS:  I can only tell you, Your Honor, that the
14 state's petition set forth hardcore cartel formation.  It set
15 forth price fixing as a method of restricting output, and I
16 think there is also a price sharing allegation that's probably a
17 rule or reason analysis, but there's at least three antitrust
18 violations alleged in that complaint.
19         And on a hardcore cartel formation, the standard I
20 don't believe is Twombly.  You would look to Tooke & Reynolds
21 and the LP&L case.  In Tooke, the Court specifically said the
22 petition clearly setout the purpose of the defendants and its
23 officers and the method of the procedure and what they did in
24 order to accomplish it to an end, and I would suggest to this
25 Court that the State's petition does just that.

1    THE COURT:  Mr. Lee, what is your response as it
2 relates to the statement that there were sufficient facts in the
3 complaint to support the theory, the allegation -- we all know
4 and they even agree that Twombly holds that you just can't
5 merely cite that there was in fact a conspiracy, but you have to
6 have facts to support that.
7    MR. LEE:  Exactly, Your Honor.
8    THE COURT:  Mr. Watkins had just stated three instances
9 that he feels --
10   MR. LEE:  Your Honor, counsel talks about a cartel.
11 They've alleged a cartel.  Well, frankly, they haven't alleged
12 any facts that establishes a cartel.  And what their complaint
13 is that they're entitled to damages which is the result of the
14 insurance, you know, payments that have been made and the
15 difference between what they would have been paid or not paid,
16 or would have been paid if the estimates would have been higher.
17 Well, Your Honor, we don't control that pricing.  It's an
18 estimate and only an estimate.  It's impossible to be a cartel
19 when you can't even control your own prices.
20   Insurance companies rates and prices are controlled by
21 the insurance commissioners of the respective jurisdictions in
22 which they operate.  They don't control each other's prices.
23 There is no question.  There is no allegation that the insurance
24 companies prices are all subject of a conspiracy.  That's not
25 there.  The complaint that they've alleged is you underpaid us

1  on the insurance claim.  That's a plain and simple breach of
2  contract claim, Your Honor, not an antitrust conspiracy claim.
3  Twombly clearly applies, and what Judge Duval found and which is
4  supported the instructions by the Insurance Commissioner is any
5  insurer would have a justifiable reason for using these programs
6  independently of what any other insurer would do because of the
7  benefits that it would provide in terms of efficiency and
8  quickness.

9           Your Honor, there used to be a time when insurance
10 companies would say, you've got a claim, go get three and three
11 estimates and we'll figure out a number.  Well, you can't do
12 that any more, and you certainly can't do it during the course
13 of a catastrophe, because you can't get contractors out there to
14 do the estimating any way, so you've got to have some tool
15 that's going to allow you to do this stuff to come up with
16 estimates quickly and indeed Louisiana law requires you to do it
17 quickly or otherwise you're going to be subject to bad faith
18 penalties, and you ought to have a way of doing it insistently
19 because otherwise you're going to be exposed again for bad
20 faith, because you're going to be arbitrary and capricious in
21 doing things differently, so you need to have a system, and
22 that's what they did, and what Judge Duval found is any insured
23 would have a justifiable reason regardless of what other people
24 did and therefore there can't be a conspiracy, and that's the
25 heart of their claim.  It cannot survive as an antitrust claim.

1        THE COURT: All right, sir. Go ahead and rap it up.
2        MR. WATKINS: And that is precisely why the Farmers
3   video is so important. It shines the light on one company's
4   decision to adopt this program and it was not an independent
5   decision. It was the result of meetings with virtually all the
6   defendants in this case, and I would suggest to Your Honor that
7   is direct evidence of a use and collusion by these companies of
8   inviting Farmers group into their conspiracy and how they work.
9   The strategies they used, the technologies they used, and where
10  they're headed. That is not the activity of a competitor. That
11  is competitors working together and inviting another competitor
12  into all of their companies in describing the same thing, and as
13  a result of that, not an independent decision because it's a
14  great program, a decision because these other companies are
15  using it.
16        They advertise that 80 percent of all insurers use this
17  program. That alone -- I think it's 87 percent is an automatic
18  monopoly -- the use of this program and the parallel use of this
19  program standing alone is insufficient. However, with the
20  additional facts that are alleged in our complaint taken as
21  true, I would suggest to you covers well steps beyond Twombly's
22  requirement, and that's only on the price-fixing claim.
23        We allege the price sharing with the use of Exact
24  analysis, and we also allege the Hardcore Cartel Formation that
25  is supported by ISO, is supported with McKinsey's consultations,

1   is supported by the use of these programs.  In ISO's own words,
2   that if these companies don't do, that they're going to go out
3   of business.
4               THE COURT:  Thank you.
5               MR. BROWN:  Your Honor, I was listening carefully to my
6   opposing counsel, and I think he said that a decision to do
7   something because other people are doing it makes out a
8   price-fixing conspiracy.  It most certainly does not.  And Judge
9   Duval clearly recognized that.
10              If something is profitable to do, imitation is
11  perfectly permissible.  Deciding to do something because other
12  people are doing it successfully is not an antitrust violation.
13  If it were, every industry in this country would be involved in
14  an antitrust price-fixing conspiracy.  That is not the kind of
15  specific plausible factual content that is needed to go forward
16  in a case like this.
17              One other point.  Earlier my opponent said that a
18  consultant steps across the line when it advises more than one
19  member of an industry to do something.  That is simply not the
20  law.  That is absolutely not the law.
21              MR. WATKINS:  That wasn't the whole part of the --
22              MR. BROWN:  So, you know, advising more than one person
23  to do something because it's profitable to do it, all
24  consultants do that.  If that's a price-fixing conspiracy, every
25  major consultant in this country is a price fixer.

1        THE COURT:  Do you have any final words?

2        MR. LEE:  Your Honor, I think that covers it, unless
3    you've got a question for me.

4        THE COURT:  No.  I've listened very closely.  I've
5    reviewed everything.

6        I want to say again, counsel again has done a very good
7    job.

8        Plaintiff you've been very creative in your argument,
9    but I am going to grant the motions to dismiss filed by both
10   Allstate and by McKinsey & Company, the allegations of parallel
11   conduct and bear assertion conspiracy, and I just don't feel
12   that there were any facts sufficient to allege to support these
13   are not enough to state antitrust claim under Louisiana law.  So
14   I am going to grant the motions to dismiss by both these
15   defendants, and the motion to sever is denied as moot.

16       MR. LEE:  Your Honor, just for the record, the motion
17   to dismiss was brought by all defendants.  It was filed on all
18   behalf of all defendants.  There's a separate motion by
19   Xactware, but our motion was on behalf of all defendants.

20       THE COURT:  So does this conclude this litigation?

21       MR. BROWN:  Yes.

22       MR. LEE:  I believe it does, Your Honor.

23       THE COURT:  Good luck to you, sir.

24       Thank you.

25       MR. BROWN:  Thank you, Your Honor.

1     MR. LEE:  Thank you, Your Honor.

2     MR. WATKINS:  Thank you, Your Honor.

3     THE DEPUTY CLERK:  Everyone rise, please.

4     Court's in recess.

5              *     *     *     *     *

6                     **C E R T I F I C A T E**

7

8     I, Victor D. Di Giorgio, Official United States Court
9 Reporter in and for the Eastern District of Louisiana, do hereby
10 certify that the foregoing proceedings were taken down by me in
11 shorthand at the time and place aforesaid, transcribed under my
12 personal direction and supervision, and that the preceding pages
13 represent a true and correct transcription, to the best of my
14 ability and understanding.

18                              S/Victor D. Di Giorgio
                                 Victor D. Di Giorgio, CCR
19                              Official U.S. Court Reporter